NOT DESIGNATED FOR PUBLICATION

No. 112,507

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

MICHAEL W. SHERMAN,
*Appellant.*

MEMORANDUM OPINION

Appeal from Reno District Court; TRISH ROSE, judge. Opinion filed February 26, 2016. Affirmed.

*Adam D. Stolte*, of Kansas Appellate Defender Office, for appellant.

*Amanda G. Voth*, assistant solicitor general, of Office of the Kansas Attorney General, for appellee.

Before STANDRIDGE, P.J., LEBEN and POWELL, JJ.

*Per Curiam*: A jury convicted Michael W. Sherman of attempted first-degree murder after he attacked and choked the Reno County District Attorney following a hearing. Sherman contends there was insufficient evidence that he intended to kill the district attorney. But when an appellate court looks at the sufficiency of evidence on appeal, it views the evidence in the light most favorable to the State since the jury ruled in its favor. Here, taken in that light, sufficient evidence supports Sherman's conviction because the jury could reasonably infer intent to kill from his actions—Sherman pulled a chain tight around the district attorney's neck, held the district attorney in a headlock, and

successfully maintained pressure on the district attorney's neck for about 2 to 3 minutes even as two and then three people worked to pull Sherman off.

FACTUAL AND PROCEDURAL BACKGROUND

In a prior case, Sherman pled guilty to one count of aggravated criminal sodomy. He requested that the district court give him a lesser sentence than the presumptive one provided by statute, but the district court denied his request and sentenced him to life in prison without the possibility of parole for 25 years. He appealed the sentence, and this court remanded the case for additional factual findings before deciding the appeal. See *State v. Sherman*, No. 109,244, 2014 WL 902151, at *1-2 (Kan. App. 2014) (unpublished opinion). The district court set the remand hearing for July 10, 2013.

At the remand hearing, Sherman was seated in the middle chair at the defense table and restrained with belly restraints, leg irons, and handcuffs attached by a chain to the belly restraints. Reno County Sherriff's Deputy Lance Francis sat nearby. Keith Schroeder, the district attorney, sat in the middle chair at the prosecution table.

After the judge, William F. Lyle, Jr., concluded the hearing and stood up to leave, Schroeder looked down at his phone to read a text message that had arrived during the hearing. Sherman asked his attorney whether it would be the last time he would be in court, and she said it was. When he "realized it was [his] last chance" to do something, he decided to "go after the [district attorney]."

At that point, Sherman slid off his shoes so that he could move faster and then jumped on Schroeder. Schroeder testified that he had felt like he had been hit in the neck area and had been able to feel chains around the front of his neck. Sherman got Schroeder in a headlock and was choking him. Schroeder put his chin down and used one of his hands to keep his airway clear while the chain pressed up against his skin. Schroeder

2

testified that he had used his other arm to hold onto Sherman tightly to avoid kicks and punches. Schroeder said he also braced himself for an electric shock in case officers used a Taser on Sherman.

Deputy Francis rushed over and grabbed Sherman from behind, putting him in a headlock, while Sherman still had Schroeder in a headlock. Francis then took Sherman and Schroeder to the ground. He testified that Sherman was attempting to choke Schroeder and continued to do so even as Francis used all the pressure he could to subdue Sherman in the headlock restraint. Judge Lyle, still in his judicial robe, jumped in, first focusing on getting the chain off Schroeder's neck, as he was concerned that Schroeder would be strangled. The judge pulled the chain as hard as he could and got it up and off of Schroeder.

Agent Jeff Newsum of the Kansas Bureau of Investigation, who was not in the courtroom when Sherman began his attack, then came in and pried Sherman's hands loose from around Schroeder's neck. Newsum testified that it was difficult to get Sherman's hand loose since he was holding on so tightly and resisting Newsum's efforts. Newsum told Sherman to calm down; meanwhile, Sherman's eyes started getting dimmer and dimmer from the deputy's hold. Eventually, Sherman acknowledged that he was giving up. More officers then arrived in the courtroom and secured Sherman so that Schroeder could get up without fear of being kicked. Judge Lyle testified that "the whole incident probably took 2 to 3 minutes before we had help."

As a result of the attack, Schroeder had marks in a chain pattern on his neck, an abrasion on his temple, and a bruise on his arm. He went to a clinic to be checked over but did not need any medical treatment.

Sherman testified that in the days before the hearing, he had been upset at being brought back into court and had thought about what it would be like to "duke it out" with

3

Schroeder. He said that he had never had any intention to kill Schroeder because he realized that he "was at a disadvantage being fully restrained and [with] the officer in the room," but he still thought about what he could do to get to Schroeder. Sherman testified that the judge and district attorney had provoked him at the hearing, and he admitted that he was "fully guilty of assaulting [Schroeder]." Sherman said that when he had jumped onto Schroeder's back, he had been able to get his forearm around Schroeder's neck and that choking Schroeder had been a "spontaneous thing" because he couldn't punch him while wearing the restraints. According to Sherman, he didn't purposely use the chains to choke Schroeder but unintentionally pressed the chains against Schroeder's neck with his forearm.

Sherman admitted that he had applied "a lot of pressure" and that he knew that choking could cause death. Sherman also acknowledged that he didn't know how long he would have continued choking Schroeder had the deputy not intervened. He also said that when the deputy got him into a chokehold while he was choking Schroeder, it became a matter of "who was going to give up first."

The State initially charged Sherman with attempted first-degree murder or, alternatively, aggravated battery. But it later amended the complaint to charge Sherman only with attempted first-degree murder. The trial was held on June 9-11, 2014.

During closing arguments, the State contended that Sherman's actions proved that he had intended to kill Schroeder, focusing on Sherman's planning before the hearing, his continued use of the chokehold on Schroeder despite an officer's intervention, and his knowledge that prolonged choking can lead to death. Sherman's attorney argued that if Schroeder had been an ordinary citizen and not the district attorney, the State would have charged Sherman with battery, not attempted first-degree murder. The attorney emphasized Sherman's claims that he never intended to kill Schroeder, arguing that the

4

State had failed to prove Sherman acted with the necessary intent to support a conviction for attempted first-degree murder.

The district court instructed the jury on attempted first-degree murder and attempted second-degree murder. Sherman's attorney had initially requested the court instruct the jury on lesser-included offenses of battery and aggravated battery but withdrew the request at trial. During deliberations, the jury asked whether the State could have brought a lesser charge against Sherman and if the charge would have been the same if Schroeder were not the district attorney. Adopting the defense counsel's suggestion, the district judge responded, "I have given [the jury] the instructions and can supply no further information." The jury ultimately convicted Sherman of attempted first-degree murder.

The court sentenced Sherman to the standard guideline sentence based on his criminal history for attempted first-degree murder, 253 months in prison with 36 months' postrelease supervision, rejecting Sherman's request for a shorter sentence.

Sherman now appeals to this court.

ANALYSIS

Sherman argues that the jury did not have sufficient evidence to convict him of attempted first-degree murder because the State failed to prove that he intended to kill Schroeder. The State counters that because intent to kill may be reasonably inferred from Sherman's actions, sufficient evidence supports the conviction.

Sufficiency-of-the-evidence challenges arise on appeal only when the factfinder—here, the jury—has determined the facts in the State's favor and convicted the defendant of a charge. Because the jury has ruled for the State, this court reviews the evidence on

5

appeal in the light most favorable to the State. We then determine whether a rational factfinder could have found the defendant guilty beyond a reasonable doubt. *State v. Bolze-Sann*, 302 Kan. 198, 203, 352 P.3d 511 (2015). In making these determinations, we do not reweigh the evidence, assess the credibility of witnesses, or resolve conflicts in the evidence. *State v. Betancourt*, 301 Kan. 282, 302, 342 P.3d 916 (2015).

To convict Sherman of attempted first-degree murder, the State had to prove beyond a reasonable doubt that Sherman attempted, but failed, to kill Schroeder; that he intended to do so; and that the crime was premeditated. See K.S.A. 2015 Supp. 21-5301(a); K.S.A. 2015 Supp. 21-5402(a). Attempt requires that the defendant performed an overt act—something beyond mere preparations—with the intent to commit a crime that he did not actually complete. K.S.A. 2015 Supp. 21-5301(a); PIK Crim. 4th 53.010; see *State v. Ortega*, 300 Kan. 761, 770, 335 P.3d 93 (2014). Intent means that it was the defendant's desire or goal to engage in the conduct or cause the result at issue in the case. K.S.A. 2015 Supp. 21-5202(h); PIK Crim. 4th 52.010. And premeditation means that the defendant "thought the matter over beforehand" and "formed the design or intent to kill before the act"; it requires more than the instantaneous, intentional act of killing someone. PIK Crim. 4th 54.150; see *State v. Qualls*, 297 Kan. 61, Syl. ¶ 2, 298 P.3d 311 (2013).

Sherman contends that the evidence wasn't sufficient to support his conviction because the State failed to prove that he intended to kill Schroeder. The State responds accurately that it is not required to present direct evidence of intent. *State v. Williams*, 299 Kan. 509, 525, 324 P.3d 1078 (2014). Rather, intent may be inferred from the circumstances of the case, so long as those inferences are reasonable. *State v. Kettler*, 299 Kan. 448, 466-67, 325 P.3d 1075 (2014). In making those inferences, "'a person is presumed to intend all the natural consequences of his acts. [Citations omitted.]'" *Williams*, 299 Kan. at 525.

Sherman argues that because his intent was only to batter Schroeder, he could at most be found guilty of aggravated battery. In support of his argument, he cites *State v. Curreri*, 42 Kan. App. 2d 460, 465-66, 213 P.3d 1084 (2009), *rev. denied* 290 Kan. 1097 (2010), and *State v. Tisdale*, 30 Kan. App. 2d 524, 525-26, 43 P.3d 835, *rev. denied* 274 Kan. 1118 (2002). Both cases hold that evidence of choking is sufficient to support a conviction for aggravated battery because great bodily harm, disfigurement, or death could result. *Curreri*, 42 Kan. App. 2d at 465-66; *Tisdale*, 30 Kan. App. 2d at 525-26. But just because choking can constitute aggravated battery doesn't mean that it can't also constitute attempted murder. Choking and strangulation can and do result in death, of course, and "[m]anual strangulation is strong evidence of premeditation because it provides time for deliberation." *State v. Lloyd*, 299 Kan. 620, 634, 325 P.3d 1122 (2014) (evidence of premeditation and intent to kill sufficient when victim was killed by strangulation). In addition, the premeditation required for first-degree murder need not arise before a violent struggle begins. See *State v. Appleby*, 289 Kan. 1017, 1060, 221 P.3d 525 (2009) (premeditation and intent to kill may even arise during episode involving strangulation). Based on Sherman's arguments on appeal, the ultimate question we must answer is whether sufficient evidence showed that Sherman intended to kill Schroeder by choking him; the jury concluded that it did.

In the light most favorable to the State and without reweighing the evidence or making credibility determinations, a rational factfinder could reasonably infer that Sherman intended to kill Schroeder. Sherman admitted that he had been mad at Schroeder and had thought beforehand about how he could get to Schroeder at the hearing. To be sure, Sherman said that he hadn't intended to kill Schroeder because he knew that he would be in restraints and that an officer would be present. But when he found out at the close of the hearing that he wouldn't be in court again, he seized the opportunity by slipping off his shoes, jumping on top of Schroeder, and getting him into a headlock. Although Sherman denied intending to kill Schroeder, he admitted to applying "a lot of pressure" while choking Schroeder and knew that prolonged choking can cause death.

7

Sherman also testified that he didn't know how long he would have continued choking Schroeder had Deputy Francis not intervened. He said that once Francis had him in a headlock, he viewed it as a battle of wills as to who would give up first. In fact, Sherman only released Schroeder after Agent Newsum had removed Sherman's hands from Schroeder's neck and he could no longer continue. Both Newsum and Francis testified that it required a great deal of force to subdue Sherman, and Lyle testified that it took 2 to 3 minutes before they could stop Sherman from trying to strangle Schroeder. A rational jury could infer from the circumstances that Sherman did intend to kill Schroeder and disregard Sherman's statements to the contrary. Sufficient evidence supports his conviction for attempted first-degree murder.

We therefore affirm the district court's judgment.